UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HUDSON BAY MASTER FUND LTD. | Civil Action No.  17 Civ. 6204 |
| Plaintiff, | |
| - against - | **COMPLAINT** |
| JOHN R. DEL PIZZO, AUSTIN J. SHANFELTER, QUENTIN P. SMITH, JR., CHARLES H. WALSH, MICHAEL J. COREY, SEAN M. BIDIC, M.D., JAMES E. O'BRIEN, MICHAEL J. PURCELL, JEFFREY P. ROHR, TERRY L. COLEMAN, GLENN T. HIBLER, and ERNST N. CSISZAR | |
| Defendants. | |

Plaintiff Hudson Bay Master Fund Ltd. ("Hudson Bay"), by its attorneys Latham & Watkins LLP, as and for its Complaint against Defendants John R. Del Pizzo, Austin J. Shanfelter, Quentin P. Smith, Jr., Charles H. Walsh, Michael J. Corey, Sean M. Bidic, M.D., James E. O'Brien, Michael J. Purcell, Jeffrey P. Rohr, Terry L. Coleman, Glenn T. Hibler, and Ernst N. Csiszar (collectively, the "Defendants") alleges as follows:

## NATURE OF THE ACTION

1.      Hudson Bay brings this action against Defendants, current and former members of the Board of Directors of Patriot National, Inc. ("Patriot National" or "the Company"),[1] for causing the Company to make false statements and enter into agreements it never intended to

---

[1] Patriot National is a conglomerate consisting of various businesses that provide technology, outsourcing and employment advisory services to insurance companies and other businesses.

fulfill—and for their continued refusal to direct the Company to make good on obligations they know it owes.

2.      In late 2015, the Patriot Board[2] explored options to raise money to address the Company's financial struggles.  Following a failed attempt at a secondary public offering, which was withdrawn after the market reacted negatively to the announcement of the offering, the Patriot Board resorted to selling the Company's shares of Common Stock (the "Shares") through a private placement.[3]  The Company pitched the deal to investors as a means of raising capital for strategic acquisitions that could grow Patriot National's business and improve its overall financial health.

3.      On December 13, 2015, Hudson Bay entered into an agreement with Patriot National and its controlling shareholder, President, Chief Executive Officer and Chairman of its Board of Directors, Steven Mariano (the "Initial Transaction").  The Initial Transaction consisted of, among other things, a Securities Purchase Agreement that provided for the sale of restricted, unregistered Shares and the issuance of Series A and Series B warrants (the "Original Series A Warrant," "Original Series B Warrant," and together the "Original Warrants").

4.      Patriot National's stock price dropped sharply upon the public announcement of the Initial Transaction.  Within days, the Patriot Board sought to rescind the Initial Transaction and negotiate a new deal structure (the "Restructured Transaction"[4]) that they knew would never be honored.  Despite being under no legal obligation to do so, Hudson Bay agreed to

---

[2] As used herein, "the Patriot Board" refers to the members of Patriot National's Board of Directors during the timeframe relevant to this Complaint.

[3] All capitalized terms not defined herein shall have the same meaning and definition provided in the Transaction Documents, as defined in Paragraph 41, *infra*.

[4] The "Initial Transaction" and "Restructured Transaction" are together referred to as the "Transaction."

accommodate the proposed amendments and, in the process, sacrificed substantial economic benefits that it had bargained for under the Initial Transaction.

5.　　On December 23, 2015, the Company, Mariano, and Hudson Bay executed the new agreement (the "Rescission and Exchange Agreement"), which the Patriot Board reviewed and unanimously approved.  That agreement amended the Securities Purchase Agreement and required Hudson Bay to, among other things, return a portion of the Shares it had purchased from Patriot National.  Critically, in order to entice Hudson Bay to renegotiate and return those Shares, the Patriot Board offered the New Warrants as part of the restructured deal.  These Warrants again provided Hudson Bay with the right to receive additional Shares upon certain triggering events, and were integral to the completion of the Restructured Transaction.

6.　　Specifically, the New Series B Warrant was fundamental to the pricing of the Restructured Transaction because it provided Hudson Bay with downside risk protection.  Since investing in unregistered shares is inherently risky, investors are naturally concerned that the value of such shares will decrease upon their issuance and before the shares become freely tradable.  The New Series B Warrant was designed as "insurance" against the risk of such a price decrease.  That risk mitigation was accomplished by a formula pursuant to which Hudson Bay would be entitled to additional shares based on the price of the publicly traded Shares: if the Share price decreased, then Hudson Bay would receive additional Shares upon exercise of the New Series B Warrant, for nominal consideration.  In that way, Hudson Bay would be protected from a decrease in the value of its Shares.

7.　　Upon Hudson Bay's exercising the New Series B Warrant, Mariano was to deliver to Patriot National, from shares he personally held, one-hundred percent of the shares owed to Hudson Bay under the terms of that Warrant, which Patriot National was to then

immediately deliver to Hudson Bay.  The aptly named "Amended Stock Back-to-Back Agreement," entered into between Mariano and Patriot National, memorialized that contractual commitment to ensure that an adequate number of Shares would be available to Hudson Bay upon its exercise of the New Warrants.

8.      Accordingly, the New Warrants, if properly honored, called for the Company to take a certain number of Mariano's Shares and deliver them to Hudson Bay.  Such a transaction naturally served to remove the value and voting rights of those Shares from Mariano by transferring the Shares to Hudson Bay.  Indeed, that was the deal that Defendants approved in exchange for Hudson Bay's agreement to rescind the Initial Transaction and enter into the Restructured Transaction.

9.      However, the Patriot Board, in collusion with and under the control of Mariano, never intended for Mariano to relinquish any of his Shares as defined by the Restructured Transaction.  From the time it considered the deal, the Patriot Board knew that the Company would never honor its obligations under the terms of the New Warrants.  Instead, it used the New Warrants as nothing more than a false promise to induce Hudson Bay to agree to the Rescission and Exchange Agreement and invest in the Company.

10.     When Hudson Bay sought to exercise the New Warrants less than four months later, the Patriot Board of Directors—in accordance with and in furtherance of its scheme— refused to have the Company deliver the Shares.  Neither the Patriot Board nor any other officer at Patriot National has provided any legitimate basis for its continued refusal.

11.     Although Patriot National has cited an inquiry into the Transaction by the Financial Industry Regulatory Authority ("FINRA") as an excuse, it has never explained how that inquiry—which Patriot's own counsel described as "routine"—could justify the Company's

continued refusal to honor Hudson Bay's exercise of the New Warrants. Notably, neither Hudson Bay nor Patriot National are FINRA-regulated entities.

12.     Hudson Bay has satisfied its end of the bargain: it paid for the New Warrants and demanded delivery of the Shares. However, in violation of iron-clad contractual commitments, the Company—under the direct control of Patriot's Board of Directors—unjustifiably refused to deliver the Shares when they came due and has continued to do so ever since.

13.     As a result of Defendants' conduct in connection with the Restructured Transaction, and in particular the New Warrants, Plaintiff Hudson Bay brings this action against the members of Patriot National's Board of Directors for securities fraud, fraudulent inducement, breach of fiduciary duties, corporate waste, and tortious interference with contract.

## THE PARTIES

14.     Plaintiff Hudson Bay is an investment fund that transacts in, among other things, investments that provide public companies with capital through equity or debt (or both). Hudson Bay is organized under the laws of the Cayman Islands and has its principal place of business located at Walker House, KY1-9005, 87 Mary Street, George Town, Grand Cayman, Cayman Islands. For purposes of diversity under 28 U.S.C. § 1332(a), Hudson Bay is a citizen of the Cayman Islands, a foreign state.

15.     John R. Del Pizzo is a natural person who, upon information and belief, is a citizen and resident of the state of Pennsylvania. Mr. Del Pizzo has served on Patriot National's Board of Directors since June 2014. For purposes of diversity under 28 U.S.C. § 1332(a), Mr. Del Pizzo is a citizen of Pennsylvania.

16.     Austin J. Shanfelter is a natural person who, upon information and belief, is a citizen and resident of the state of Florida. Mr. Shanfelter served on Patriot National's Board of

Directors from June 2014 to October 17, 2016.  For purposes of diversity under 28 U.S.C.

§ 1332(a), Mr. Shanfelter is a citizen of Florida.

17.     Quentin P. Smith, Jr. is a natural person who, upon information and belief, is a

citizen and resident of the state of Arizona.  Mr. Smith served on Patriot National's Board of

Directors from January 15, 2015 to March 30, 2017.  For purposes of diversity under 28 U.S.C.

§ 1332(a), Mr. Smith is a citizen of Arizona.

18.     Charles H. Walsh is a natural person who, upon information and belief, is a

citizen and resident of the state of Illinois.  Mr. Walsh served on Patriot National's Board of

Directors from January 15, 2015 to March 30, 2017.  For purposes of diversity under 28 U.S.C.

§ 1332(a), Mr. Walsh is a citizen of Illinois.

19.     Michael J. Corey is a natural person who, upon information and belief, is a citizen

and resident of the state of South Carolina.  Mr. Corey served on Patriot National's Board of

Directors from January 22, 2016 to November 8, 2016.  For purposes of diversity under 28

U.S.C. § 1332(a), Mr. Corey is a citizen of South Carolina.

20.     Sean M. Bidic, M.D. is a natural person who, upon information and belief, is a

citizen and resident of the state of New Jersey.  Dr. Bidic has served on Patriot National's Board

of Directors since November 17, 2016.  For purposes of diversity under 28 U.S.C. § 1332(a), Dr.

Bidic is a citizen of New Jersey.

21.     James E. O'Brien is a natural person who, upon information and belief, is a

citizen and resident of the state of Virginia.  Mr. O'Brien served on Patriot National's Board of

Directors from November 17, 2016 to May 3, 2017.  For purposes of diversity under 28 U.S.C.

§ 1332(a), Mr. O'Brien is a citizen of Virginia.

22.     Michael J. Purcell is a natural person who, upon information and belief, is a citizen and resident of the state of Pennsylvania.  Mr. Purcell served on Patriot National's Board of Directors from January 4, 2017 to April 23, 2017.  For purposes of diversity under 28 U.S.C. § 1332(a), Mr. Purcell is a citizen of Pennsylvania.

23.     Jeffrey P. Rohr is a natural person who, upon information and belief, is a citizen and resident of the state of New York.  Mr. Rohr served on Patriot National's Board of Directors from January 4, 2017 to April 26, 2017.  For purposes of diversity under 28 U.S.C. § 1332(a), Mr. Rohr is a citizen of New York.

24.     Terry L. Coleman is a natural person who, upon information and belief, is a citizen and resident of the state of Georgia.  Mr. Coleman has served on Patriot National's Board of Directors since April 23, 2017.  For purposes of diversity under 28 U.S.C. § 1332(a), Mr. Coleman is a citizen of Georgia.

25.     Glenn T. Hibler is a natural person who, upon information and belief, is a citizen and resident of the state of California.  Mr. Hibler has served on Patriot National's Board of Directors since April 23, 2017.  For purposes of diversity under 28 U.S.C. § 1332(a), Mr. Hibler is a citizen of California.

26.     Ernst N. Csiszar is a natural person who, upon information and belief, is a citizen and resident of the state of South Carolina.  Mr. Csiszar has served on Patriot National's Board of Directors since April 26, 2017 and serves as Chairman of the Audit Committee.  For purposes of diversity under 28 U.S.C. § 1332(a), Mr. Csiszar is a citizen of South Carolina.

27.     Defendants are collectively referred to as "the Patriot Board."

## JURISDICTION AND VENUE

28.     Certain of the claims asserted herein arise under and pursuant to §§ 10(b) and

20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5

promulgated thereunder by the Securities and Exchange Commission (17 C.F.R. § 240.10b-5).

29.     This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30.     This Court additionally has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2),

because the action is brought by a citizen of a foreign state against citizens of States within the

United States, and the matter in controversy exceeds the sum or value of $75,000 exclusive of

costs and interest.

31.     Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C.

§ 1391(a), in that it is a judicial district in which a substantial part of the events or omissions

giving rise to the claims occurred, including, but not limited to, negotiations of the relevant

transaction documents, Hudson Bay's execution of the same, and the closing of the Transaction

giving rise to this action.

32.     Additionally, in Section 11 of the Warrants, Section 9(a) of the Securities

Purchase Agreement, and Section 8(c) of the Rescission and Exchange Agreement, Defendants

consented to jurisdiction and venue in the United States District Court for the Southern District

of New York.  Pursuant to those same provisions, the Warrants, the Securities Purchase

Agreement, and the Rescission and Exchange Agreement are governed by and subject to

interpretation under New York law.

33.     In connection with the wrongs and other acts alleged in this Complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

8

including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## FACTUAL ALLEGATIONS

### The Securities Purchase Agreement

34.     On November 25, 2015, Christopher A. Pesch, Executive Vice President, General Counsel & Chief Legal Officer of Patriot National, emailed the Patriot Board providing a proposed engagement letter with a placement agent to pursue the Initial Transaction.

35.     On December 9, 2015, Mr. Pesch emailed the Patriot Board requesting to schedule a board meeting "to approve the transaction and the documents."

36.     On December 13, 2015, the Patriot Board unanimously resolved to, among other things: (i) appoint the placement agent to pursue the Initial Transaction; (ii) approve the Securities Purchase Agreement; and (iii) approve the Stock Back-to-Back Agreement (described below).

37.     Pursuant to the Securities Purchase Agreement, the Patriot Board approved the sale of (a) 750,000 Shares directly from Patriot National,[5] (b) 1.125 million Shares directly from Mariano, and (c) the Original Warrants to Hudson Bay for a total purchase price of $22.5 million.

38.     As part of the Securities Purchase Agreement, the Patriot Board approved the terms of the Original Series B Warrant.  The Original Series B Warrant contained an adjustable share mechanism under which the number of Shares that could be exercised under the Warrant was subject to a formula set forth in the Warrant.  Notably, the Shares underlying the Original

---

[5] The aggregate number of Shares Hudson Bay purchased from Patriot National included 250,000 outstanding Shares and 500,000 Shares deliverable to Hudson Bay for no additional consideration (other than a nominal exercise price of one penny for each Share) as base Shares under the Original Series B Warrant.

Series B Warrant were "pre-funded," in that they were included in the purchase price paid by Hudson Bay to the Defendants at closing, except for a nominal exercise price of one penny for each Share.

39.     Pursuant to the terms of the Original Series B Warrant, sixty (60) percent of any additional Shares to be delivered to Hudson Bay pursuant to the adjustable Share component were to come from Mariano.  Accordingly, to ensure that Mariano would provide the Shares necessary to satisfy exercises of the Original Warrants, the Patriot Board approved the Stock Back-to-Back Agreement.  Under that agreement, Mariano agreed to sell to Patriot National, and Patriot National agreed to purchase from Mariano, a number of Shares equal to sixty (60) percent of the Shares deliverable to holders of the Original Warrants upon the exercise thereof.

40.     In addition, as part of the Securities Purchase Agreement the Patriot Board agreed to give "irrevocable instructions to [the Transfer Agent] . . . in a form acceptable to [Hudson Bay and the other investors]" to issue certificates or credit Shares "for the Common Shares and the Warrant Shares in such amounts as specified" by Hudson Bay upon exercise of the Original Series B Warrant.

41.     As is customary in private placement transactions that require the negotiation and execution of numerous ancillary agreements and sub-documents, the representations and warranties of Defendants Patriot National and Mariano repeatedly refer to their obligations under the "Transaction Documents," which Section 3(a)(ii) of the Securities Purchase Agreement defines as follows:

"'Transaction Documents' means, collectively, this Agreement, the Common Shares, the [Original] Warrants, the Registration Rights Agreement, the Irrevocable Transfer Agent Instructions . . . *and each of the other agreements and instruments entered into or delivered by any of the parties hereto in connection with the transactions contemplated hereby and thereby, as may be amended from time to time*." (emphasis added).

42. On the same day the Patriot Board approved the Initial Transaction, December 13, 2015, Patriot National issued a Form 8-K detailing the Initial Transaction. The Form 8-K stated that, under the Securities Purchase Agreement, "the Company will issue and sell . . . warrants to purchase up to an aggregate of 2,083,333 shares of Common Stock." It further stated that under the Stock Back-to-Back Agreement, "the Company will repurchase a number of shares of Common Stock owned by [Mariano] equal to 60% of the Warrant Shares to be issued in connection with the exercise . . . of the Warrants."

**The Patriot Board Decides to Rescind the Initial Transaction**

43. The market reaction to the Initial Transaction was severe. On Friday, December 11, 2015 (prior to announcement of the Transaction), Patriot National's share price was $13.08 per share; after the announcement, on Monday, December 14, 2015, Patriot National's stock price fell to $7.79 per share, and on Tuesday, December 15, 2015 fell even further to $6.59 per share. Based on the market reaction, it was apparent to Defendants that they could not proceed with the Initial Transaction as drafted.

44. Within a few days after the closing of the Initial Transaction, Patriot National told Hudson Bay that certain of its institutional shareholders were unhappy with its terms, and that Patriot National was under a great deal of pressure to rescind its sale of Shares and to restructure the Initial Transaction. With regard to the Original Series B Warrant, Patriot National claimed that the price for its Shares had dropped lower than it had anticipated, which would obligate Patriot National to deliver Hudson Bay a larger than expected number of Shares upon Hudson

Bay's exercise of the Warrant.  The Company therefore sought to delay the measuring period of the stock price used in the share adjustment formula of the Original Series B Warrant to a time when it was expected that the Share price would be higher, thus reducing the number of Shares issuable to Hudson Bay upon exercise of the Series B Warrants and reducing Hudson Bay's consideration.

45.     Without holding any board meeting, and without any fairness opinion, the Patriot Board approved amendments to the Initial Transaction.  Hudson Bay agreed to Patriot National's request to re-negotiate and restructure the Initial Transaction, and to significantly reduce the total size of the investment.  Specifically, Hudson Bay agreed to give back to Patriot National the Shares that it purchased directly from the Company, and keep the Shares purchased directly from Mariano.  By accommodating Patriot National, Hudson Bay agreed to walk away from an investment opportunity with significant potential economic upside when it had no contractual obligation to do so.

46.     During the time leading up to the execution of the Restructured Transaction, Mariano exchanged emails with individuals on the Patriot Board regarding when and under what circumstances Hudson Bay would be able to exercise its rights under a proposed new set of warrants.  During this time, Mariano and the Patriot Board explored ways to delay Hudson Bay's ability to exercise the warrants, as well as scenarios in which Hudson Bay would never exercise its warrants—underscoring Defendants' knowledge that the Company never intended to, and that Defendants would not cause the Company to, honor the terms of the Restructured Transaction, and more specifically, the New Warrants, particularly if the Company's stock price did not rebound from its severe decline following announcement of the Initial Transaction.

47.     On December 22, 2015, the Patriot Board unanimously approved a proposed Rescission and Exchange Agreement, which, among other things, amended certain provisions of the Securities Purchase Agreement and exchanged the Original Warrants for the New Warrants.

48.     Specifically, the Patriot Board "deem[ed] it advisable and in the best interests of the Company and its stockholders that as part of the Rescission, the Company exchange the warrants previously issued . . . for new warrants to purchase up to an aggregate of 3,250,000 shares of Common Stock [ ]."  Accordingly, the Patriot Board approved the Rescission and Exchange Agreement and the Amended and Restated Stock Back-to-Back Agreement.

49.     Under the terms of the Rescission and Exchange Agreement, Patriot National returned $9 million to Hudson Bay and Hudson Bay surrendered the equivalent of 750,000 Shares (through the return of the 250,000 Shares it had purchased from Patriot National and the elimination of Hudson Bay's rights to 500,000 Shares through the base Share component of the Original Series B Warrant).

50.     Mariano, however, kept the $13.5 million that Hudson Bay paid to him for the 1,125,000 Shares Hudson Bay purchased directly from Mariano.  Shortly thereafter, Mariano funnelled the majority of these proceeds into Guarantee Insurance Group, Inc. ("Guarantee Insurance"), an entity in which Mariano holds a 96-percent stake.

51.     Like the Original Series B Warrant, the New Series B Warrant was "pre-funded," in that Hudson Bay already has paid for the Shares that it is owed upon exercise of the New Series B Warrant, except for the nominal penny-per-Share exercise price.

52.     One key difference between the obligations under the Original Warrants and those under the New Warrants is that Mariano holds one hundred (100) percent of the Shares

deliverable pursuant to the New Warrants, as compared to sixty (60) percent of the Shares deliverable pursuant to the Original Warrants.

53.     Accordingly, upon the execution of the Rescission and Exchange Agreement, Mariano and Patriot National entered into the Amended Back-to-Back Agreement, under which Mariano agreed to sell to Patriot National, and Patriot National agreed to purchase from Mariano, one hundred (100) percent of the amount of Shares deliverable to holders of the New Warrants upon the exercise thereof.  By obligating Mariano to deliver to Patriot National the full amount of any Shares deliverable to holders of the New Warrants upon exercise thereof, the Amended Back-to-Back Agreement was purportedly intended to ensure that Patriot National would be able to honor its obligations under the New Warrants without diluting the public shareholders.

54.     However, the Patriot Board never intended to cause the Company to honor its obligations under the Restructured Transaction, specifically the New Series B Warrant.  Rather, the Patriot Board always intended for Mariano to benefit from the Restructured Transaction no matter what, in that he would reap the financial benefits of Hudson Bay's investment, but would never be compelled to give up large quantities of shares or his control of the company, even if that is what would be legally required by the exercise of the New Series B Warrant issued to Hudson Bay as consideration for the investment.

55.     Indeed, under the Amended Back-to-Back Agreement, Mariano represented and warranted that he "at all times shall (a) own sufficient shares of Common Stock to satisfy his obligations under Section 1.1 . . . , (b) not sell or transfer (contingently or otherwise) any shares of Common Stock that will leave him with ownership of less than such number of shares of Common Stock, and (c) not place or permit to exist any liens, charges or encumbrances." (Amended Back-to-Back Agreement § 4.1.)  Yet, the Patriot Board was aware that Mariano had

already pledged 11,855,480 shares—the vast majority of his holdings in Patriot National—as collateral under two personal credit agreements that he entered into prior to the Rescission and Exchange Agreement. Defendants thus knew that Mariano did not possess sufficient unencumbered stock to satisfy his obligations under the Amended Back-to-Back Agreement, and that the Amended Back-to-Back Agreement thus misrepresented Mariano's—and thereby Patriot National's—ability to fulfill the terms of the Warrants.

56.     Upon the Patriot Board's approval and the parties' subsequent execution of these transactions, the Company filed a Form 8-K on December 23, 2015.  That filing provided that "the Company has exchanged the warrants previously issued by the Company to each of the Investors for new warrants [ ] to purchase up to an aggregate of 3,250,000 shares of Common Stock [ ]."  The 8-K further provided that the Company had executed the Amended Back-to-Back Agreement, "pursuant to which the Company will repurchase a number of shares of Common Stock owned by [Mariano] equal to 100% of the New Warrant Shares to be issued in connection with the exercise by Investors of the New Warrants."  Upon information and belief, the Patriot Board reviewed and approved of the language in the Form 8-K even though it never intended to honor the terms of the New Warrants or the Amended Back-to-Back Agreement.

**The New Warrants**

57.     The Rescission & Exchange Agreement replaced the Original Warrants with the New Warrants, which were delivered to Hudson Bay on December 23, 2015.

58.     The New Series A Warrant permits Hudson Bay to purchase Common Stock from Patriot National—at any time on or after July 1, 2016—by delivering an "Exercise Notice" in the form prescribed by the New Series A Warrant.  That Warrant provided Hudson Bay with the right to purchase 1,462,500 shares of Patriot Common Stock (subject to adjustment under certain

conditions) at the lesser of (i) a fixed price of $10 per share, or (ii) the Variable Exercise Price, which is calculated as 85% of the Market Price of Patriot shares as of the exercise date (as the term "Market Price" is defined in the New Series A Warrant).

59.     The New Series B Warrant permits Hudson Bay to purchase Shares from Patriot National at a "nominal exercise price of $0.01 . . . per Warrant Share" by delivering an "Exercise Notice" in the form prescribed by the New Series B Warrant.  The New Series B Warrant expressly states that the "Aggregate Exercise Price" for the Shares deliverable under the Warrant was "pre-funded to [Patriot National] on or prior to the initial Issuance Date and, consequently, no additional consideration (other than the [nominal exercise price of one cent per Share]) shall be required to be paid by [Hudson Bay] to any Person to effect any exercise of this Warrant."

60.     The number of Shares that Hudson Bay is entitled to purchase under the New Series B Warrant is determined by a formula principally set out in Section 2(b) of the Warrant. That Section provides that the number of Shares that "may be purchased upon exercise of this [New Series B Warrant] shall equal . . . the Adjustment Share Amount."  The Adjustment Share Amount is a number that equals the difference between (i) the quotient of the price paid for Mariano's Shares under the Securities Purchase Agreement ($13,500,000) divided by 90% of the lowest 10-day volume-weighted average stock price between February 1, 2016 and April 4, 2016—and (ii) the number of Shares that Hudson Bay purchased under the Securities Purchase Agreement from Mariano (1,125,000 Shares).

61.     As explained above, the function of the Series B Warrant and its Adjustment Share Amount formula was to provide downward purchase-price protection for Hudson Bay. Specifically, if the price of publicly traded Shares of Patriot National fell below the price that

Hudson Bay paid for the Shares under the Securities Purchase Agreement ($12 per share),[6] then the number of Shares deliverable pursuant to the New Series B Warrant would increase.  The additional shares that Hudson Bay would receive pursuant to the New Series B Warrant effectively served to reduce the price per Share that Hudson Bay paid as compensation for the decline in the market value of the Shares.  So, although Hudson Bay received 1,125,000 shares in exchange for $13.5 million under the Securities Purchase Agreement, it could receive additional shares under the New Series B Warrant for almost no additional consideration.[7]

62.     Pursuant to Section 1(a) of the New Warrants, Patriot National is required to deliver the Shares called for by an Exercise Notice within three (3) trading days of receipt of such a Notice.

63.     Under Section 1(g)(i) of the New Warrants, Patriot National must, "at all times[,] keep reserved for issuance under [the Warrants] a number of shares of Common Stock at least equal to the maximum number of shares of Common Stock as shall be necessary to satisfy the Company's obligation to deliver shares of Common Stock under the [Warrants] then outstanding . . . ."

64.     In addition, under Section 1(g)(ii) of the New Warrants, in the event that Patriot National does not have a sufficient number of authorized Shares to satisfy its obligations, Patriot National must "immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for all the [Warrants] then outstanding."  The foregoing underscores Patriot

---

[6] Under the Securities Purchase Agreement, as amended by the Rescission and Exchange Agreement, Hudson Bay purchased 1,125,000 Shares from Mariano for a total price of $13,500,000, or $12 per Share.

[7]    Accordingly, if, for example, the Adjustment Share Amount yielded an additional 1,125,000 shares through exercise of the warrant, Hudson Bay's effective purchase price of the Shares would be $6 ($13.5 million for 2.5 million shares) rather than $12 ($13.5 million for 1.25 million shares).

National's stringent duty to be in a position to deliver—within three (3) trading days—the Shares deliverable pursuant to the Warrants upon exercise thereof.

65.    Section 1(f)(i) of the New Warrants includes a blocker provision designed to ensure that Hudson Bay will not become, as a result of holding the Warrants, a beneficial owner of more than 4.99% of Patriot National's issued and outstanding Shares (the "Blocker Provision").  The Blocker Provision limits Hudson Bay's ability to exercise its Warrants in the event it ever holds 4.99% of Patriot National's issued and outstanding Shares.  In order to acquire additional stock under the Warrants, Hudson Bay must first sell such Shares, so that its beneficial ownership level falls below 4.99%, at which time it is permitted to exercise the Warrants again up to 4.99% of Patriot National's stock.

66.    As protection against the very type of breach that is now occurring, the New Warrants—as approved by the Patriot Board—provide that the Company shall pay any costs incurred by Hudson Bay, including attorneys' fees, to enforce and/or collect upon the Warrants. Section 15 of each Warrant states that:

> "If … this Warrant is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the holder otherwise takes action to collect amounts due under this Warrant or to enforce the provisions of this Warrant … then [Patriot National] shall pay the costs incurred by [Hudson Bay] for such collection, enforcement or action … including, without limitation, attorneys' fees and disbursements."

67.    Furthermore, under Section 3 of the New Warrants, Hudson Bay is entitled to participate in any cash dividend paid by Patriot while it still holds the Warrants, up to the total number of Shares underlying the Warrants.

**Plaintiff's Exercise of the New Series B Warrant**

68.    Although the Series B Warrant's measuring period for the Adjustment Share Amount had been moved to a later date as an accommodation to Patriot National, during such

period the Company's stock price fell even lower than the price to which it had fallen after announcement of the Initial Transaction.  The lower stock price during the modified measuring period was due principally to Patriot National's February 24, 2016 earnings announcement for the fourth quarter of 2015, which fell short of the Company's previous projections and led one analyst (SunTrust) to downgrade Patriot National's stock on February 26, 2016.

69.     In its Form 10-K filing with the Securities and Exchange Commission on March 21, 2016, Patriot National stated that "[b]ased on the lowest 10-day volume-weighted average stock price during the period commencing on February 1, 2016 through March 17, 2016 of $4.51, we estimate that 4,895,985 shares of our common stock would be issuable upon exercise of the New Series B Warrants."

70.     On March 28, 2016, Hudson Bay sent an email to Patriot National asking Patriot National to confirm Hudson Bay's calculations of the number of Shares Hudson Bay was entitled to purchase pursuant to the New Series B Warrant.  In the email, Hudson Bay calculated that it was eligible to receive up to 2,203,511 Shares pursuant to the New Series B Warrant (without regard to the Blocker Provision), and specifically that it could "exercise to receive up to 2,069,457 registered shares for a Series B exercise, with the balance of 134,054 shares being restricted[.]"  Patriot National did not respond to the March 28, 2016 email and, as of the date of this Complaint, has not taken issue with Hudson Bay's calculations regarding the number of Shares it is entitled to purchase pursuant to the New Series B Warrant.  Accordingly, Patriot National has waived any objection it might otherwise have to that calculation.

71.     On April 5, 2016, Hudson Bay submitted an exercise notice to Patriot National for the delivery of 1,000,000 Shares under the New Series B Warrant (the "First Series B Exercise Notice").  On April 8, 2016, Hudson Bay submitted a second Exercise Notice pursuant to the

New Series B Warrant, this time for the delivery of 356,004 Shares (the "Second Series B Exercise Notice," and together with the First Series B Exercise Notice, the "Series B Exercise Notices").

72. On April 8, 2016, Hudson Bay paid the exercise price for all the Shares subject to the Series B Exercise Notices.[8] Accordingly, 1,000,000 Shares were due to be delivered to Hudson Bay on Friday, April 8, 2016 and 356,004 Shares were due to be delivered on April 13, 2016. Hudson Bay wanted the ability to sell those Shares immediately upon receipt, subject to favorable market conditions.

73. The Shares already held by Hudson Bay, plus the 1,356,004 Shares subject to the Series B Exercise Notices, constituted 4.99% of Patriot National's issued and outstanding stock. Therefore, pursuant to the Blocker Provision, Hudson Bay could not acquire additional shares from the New Series B Warrant until it received delivery of Shares and sold them. It was thus precluded from delivering an additional Exercise Notice for the balance of the 847,507 Shares underlying the New Series B Warrant until such time as Patriot National delivered that amount of Shares to Hudson Bay, and Hudson Bay sold them.

**The Board of Directors Refuses to Honor the New Series B Warrants**

74. In spite of Hudson Bay's accommodation in agreeing to restructure multiple aspects of the original deal shortly after closing, Defendants nevertheless refused to cause Patriot National and Mariano to deliver the Shares when Hudson Bay submitted its Series B Exercise Notices. The same day that Hudson Bay delivered its First Series B Exercise Notice, counsel for Patriot National sent a letter to Hudson Bay stating that Patriot National "will not honor" the notice pending the resolution of an investigation into the Transaction by FINRA.

---

[8] Patriot National subsequently returned those funds, presumably based on its unjustified refusal to honor the Exercise Notices.

75.     Patriot National claimed that, in January 2016, FINRA "had launched an investigation into the Transaction to determine the extent, if any, of any fraudulent or unlawful activity that may have occurred leading up to or in connection with the Transaction."  Patriot National had never previously notified Hudson Bay of the investigation.  Moreover, neither Hudson Bay nor Patriot National are regulated by, or subject to, the jurisdiction of, FINRA. Patriot National has never explained how the FINRA investigation—which its own counsel advised the Company was "routine"—could justify its refusal to honor the Series B Exercise Notices.

76.     That Patriot National's reference to the January 2016 FINRA investigation was merely a pretext to avoid the Company's and Mariano's delivery obligations pursuant to the New Warrants is made clear by the other actions that Patriot National has taken with regard to the Shares since that alleged investigation began.  Namely, in February and March 2016, Patriot National registered with the Securities and Exchange Commission the Shares delivered pursuant to the Transaction and the Shares to be delivered pursuant to the Warrants.  It was only *after* Hudson Bay delivered its First Exercise Notice, that Patriot National claimed that a FINRA investigation purportedly precluded Patriot National from honoring its obligations under the New Series B Warrant.

77.     Notably, Patriot National did not identify any contractual provision that excused its failure to deliver the fully-paid-for Shares to Hudson Bay.  Nor could it, as such failure is uncontrovertibly a breach of the plain terms of the New Series B Warrant.

78.     Indeed, the New Warrants were structured by sophisticated business parties and their counsel so as to be readily exercisable on three-days' notice.  Covenants obligate Patriot National to reserve the amount of Shares exercisable under the New Warrants.  A separate

agreement was entered into between Patriot National and Mariano (the Back-to-Back Agreement), precisely to ensure that the Shares would be available for prompt delivery.

79.     On April 6, 2016, Hudson Bay responded to Patriot National's letter advising Patriot National that it had not provided any valid basis or justification for its decision not to honor the First Series B Exercise Notice and further demanding that Patriot National, through action of Defendants, deliver the Shares deliverable pursuant to the New Series B Warrant by April 8, 2016.

80.     On April 7, 2016, counsel for Hudson Bay sent an email to counsel for Patriot National demanding that Patriot National identify any defenses (other than the purported FINRA investigation) for Patriot National's failure to perform under the New Series B Warrant.

81.     On April 11, 2016, Patriot National's counsel provided another non-response. Patriot National once again claimed that a FINRA investigation excused its failure to deliver, and it once again failed to provide a contract-based justification for its breach.

82.     On April 13, 2016, Mr. Pesch emailed Messrs. Shanfelter, Smith, Walsh, Corey and Mariano a letter from Hudson Bay.  The letter, addressed to the Board of Directors, discussed the "Company's decision to repudiate and breach the New Series B Warrant," and presented the financial damage this conduct has caused Hudson Bay, as well as the Company itself.  It stated that Mariano's conduct and the Company's refusal to recognize the New Series B Warrants has caused Hudson Bay to incur attorneys' fees and related costs, which the Company is required to reimburse pursuant to Section 15 of the New Series B Warrant.  It provided that if the Board of Directors "does not instruct the Company and/or Mr. Mariano to honor the terms of the New Series B Warrant by delivering the shares to Hudson Bay . . . the directors may be held personally liable for harm caused to the Company and its shareholders."

83.     As it had done since the date Hudson Bay first sought to exercise its rights under the New Series B Warrant, the Patriot Board refused to take any action in response to the ongoing repudiation of the New Series B Warrant.

84.     The Board of Directors' intentional and unjustified refusal to take any action to cause the Company to honor the Series B Exercise Notices—which the Company was obligated to recognize through, among other things, the terms of the Rescission and Exchange Agreement and the Amended Back-to-Back Agreement—contributed to Hudson Bay's inability to receive the 1,356,004 Shares it was owed pursuant to those agreements.  In addition, the Board of Directors' refusal to cause the Company to deliver the Shares pursuant to the Series B Exercise Notices prevented Hudson Bay from exercising an additional 847,507 deliverable Shares due to the Blocker Provision in the New Series B Warrant.

**The Board of Directors Refuses to Honor the New Series A Warrants**

85.     On July 1, 2016, the New Series A Warrant became exercisable.

86.     On August 1, 2016, Hudson Bay delivered to Patriot National an Exercise Notice under the Series A Warrant for 100 shares (the "Series A Exercise Notice").

87.     At the time, Hudson Bay wanted to obtain additional shares under the Series A Warrant.  However, in a telephone call with Hudson Bay's counsel on August 1, Patriot National refused to confirm that it would honor any exercise of the New Series A Warrant.

88.     To date, Patriot National has failed to deliver the 100 shares demanded in the Series A Exercise Notice, and there is nothing to indicate that Defendants will cause the Company to honor any further Exercise Notice issued under the Series A Warrant.

89.     Throughout this time, despite its power to take corrective action, the Board has stood idle, failing to respond to the Company's and Mariano's breaches of their obligations

under the New Series A Warrant, causing continued financial harm to both Hudson Bay and the Company itself.

90.     Hudson Bay remains a Patriot National shareholder as of the date of the filing of this Complaint, to whom Defendants owe obligations under the New Warrants and fiduciary duties.

**Defendants Have Allowed Mariano to Funnel Company Money For His Personal Benefit**

91.     Despite Hudson Bay's clear entitlement to receive Patriot National shares in accordance with the New Warrants, the Patriot Board has allowed the Company and Mariano to drain Company assets in order to benefit Mariano. The Patriot Board has made those decisions in lieu of honoring its obligations under the Amended Back-to-Back Agreement, and at the expense of Hudson Bay's clearly defined contractual rights under the terms of the Restructured Transaction.

92.     For example, since fraudulently inducing Hudson Bay to enter into the Restructured Transaction, the Board has approved multiple share repurchase programs for the purpose of artificially inflating the price of Patriot National stock. The Patriot Board's decision to spend Company assets to repurchase shares has not only enriched Mariano by inflating the stock that he now wrongfully holds, but it has also actively thwarted Hudson Bay's ability to exercise its rights under the New Series B Warrants.

93.     In addition, in November 2016, the Board unanimously approved a leveraged recapitalization championed by Mariano, which in truth was nothing more than a scheme to funnel cash, tax-free, via a dividend into Guarantee Insurance, again, an entity owned almost entirely by Mariano.

94.     These actions—in which the Board has repeatedly chosen to use Company capital to enrich Mariano rather than to satisfy known and clearly defined obligations to Hudson Bay under the Restructured Transaction—further evidence that the Patriot Board never intended to honor the terms of the New Warrants in the first place.

## FIRST CLAIM FOR RELIEF
### SECTION 10(b) OF THE EXCHANGE ACT AND
### RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendants Del Pizzo, Shanfelter, Smith & Walsh )

95.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if they were fully set forth herein.

96.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission.

97.     Upon the negative market reaction to the Initial Transaction, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business that operated as a fraud and deceit upon Plaintiff; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.

98.     Specifically, the terms of the New Warrants—which unambiguously provide Hudson Bay the right to purchase Patriot National Shares—constitute a fraud *ab initio*.  The Patriot Board approved the issuance of the New Warrants to Hudson Bay, knowing that the Company would never honor those commitments.  Further, the terms of the Transaction

25

Documents, including but not limited to the New Warrants, contain covenants and representations regarding  the amount of Shares Patriot National had, and would maintain, in reserve for purposes of Hudson Bay's exercise of the New Warrants, which were demonstrably false and misleading.

99.     The New Warrants were, and are, an integral part of the Transaction entered into by Hudson Bay and were knowingly presented as such by Defendants, both in executing the Transaction and in publicly disclosing the Transaction in Form 8-K filings with the Securities and Exchange Commission.  Defendants reviewed and unanimously approved the Restructured Transaction, including the New Warrants, despite knowing that the Transaction Documents contained false statements and that Defendants did not intend to cause Patriot National or Mariano to abide by the terms of the Restructured Transaction, and the New Warrants in particular.

100.     Such scheme was intended to and did (i) deceive Plaintiff as alleged herein and (ii) cause Plaintiff to purchase Patriot National Shares when it otherwise would not have.

101.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation or issuance of statements and documents described above, including statements made to Plaintiff that were designed to influence the market for Patriot National securities.  Such statements and documents were materially false and misleading in that they failed to disclose material information and misrepresented the truth about Patriot National's true intentions with respect to the Restructured Transaction.

102.     By virtue of their positions at Patriot National, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and

26

intended thereby to deceive Plaintiff, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

103.   Defendants were personally motivated to make false statements and omit material information necessary to the make the statements not misleading.  In particular, as disclosed in relevant Securities and Exchange Commission filings, Defendants are compensated in part by stock awards and were thus incentivized to complete the Transaction, particularly the Rescission and Exchange Agreement which would eliminate the predicted share dilution caused by the Initial Transaction.   Defendants anticipated that the Restructured Transaction would boost the Company's stock price and thus made the foregoing misstatements in order realize substantial, expected personal gain.

104.   Moreover, because Patriot National was at all times relevant hereto majority-owned by Mariano, who thus exercised control over the Patriot Board, Defendants were personally motivated to protect Mariano's interests, including by inducing Hudson Bay to enter into the Restructured Transaction for Mariano's benefit while never intending to compel Mariano to transfer the Shares owed to Hudson Bay upon exercise of the New Series B Warrant.

105.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the directors of Patriot National, Defendants had knowledge of the details of Patriot National's internal affairs.

106.    Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Patriot National.  Defendants knowingly made false statements in, and in connection with the issuance of, the New Warrants. The misstatements were directed at Hudson Bay for the purpose of enticing Hudson Bay to enter into the Restructured Transaction.  Hudson Bay reasonably relied on the misstatements, and, had Hudson Bay known of the misstatements and that Patriot National would not honor its obligations under the New Warrants, it would not have entered into the Restructured Transaction.  Furthermore, the price and/or value of the Patriot National securities at issue—the Warrants and the Shares owed under them—declined sharply upon disclosure of Patriot National's refusal to honor them, causing injury to Hudson Bay.

107.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

108.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases and acquisitions of Patriot National's securities upon the disclosure that Patriot National refused to, and continues to refuse to, honor the Warrants.

**SECOND CLAIM FOR RELIEF**
**SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Del Pizzo, Shanfelter, Smith & Walsh)**

109.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if they were fully set forth herein.

110.    At all relevant times herein, by virtue of their high-level positions, agency, and their ownership and contractual rights, as well as their participation in or awareness of the materially false and misleading statements disseminated to Plaintiff, Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Patriot National, including the content and dissemination of the statements and documents that Plaintiff contends are misleading, in connection with the particular transactions giving rise to the securities violations alleged herein.

111.    As set forth above, Patriot National violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.

112.    By virtue of their positions as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Patriot National's securities.

**THIRD CLAIM FOR RELIEF**
**FRAUDULENT INDUCEMENT**
**(Against Defendants Del Pizzo, Shanfelter, Smith & Walsh)**

113.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if they were fully set forth herein.

114.    Defendants made knowing misrepresentations of presently existing material fact intended to deceive Plaintiff and to induce Plaintiff into entering the Restructured Transaction, specifically the Rescission and Exchange Agreement.

115.    Further, Defendants misrepresented Patriot National's presently existing ability to fulfill the terms of the Warrants.  Mariano entered into the Amended Back-to-Back Agreement with Patriot National, under which Mariano is required to sell to Patriot National one hundred

(100) percent of the number of Shares that are deliverable to Hudson Bay under the Warrants. Given that Mariano had pledged 11,855,480 shares as collateral under two credit agreements that he entered into personally prior to execution of the Rescission and Exchange Agreement, Defendants misrepresented Mariano's ability to freely transfer the required shares under the Back-to-Back Agreement, and thereby misrepresented Patriot National's ability to fulfill the terms of the Warrants.

116.    Plaintiff reasonably relied upon Defendants' knowing misrepresentations of material fact in entering into the Securities Purchase Agreement and the Rescission and Exchange Agreement and has suffered injury as a result.

**FOURTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTY**
**(Against All Defendants)**

117.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if they were fully set forth herein.

118.    Each of the Defendants owed and owe fiduciary duties to Patriot National and its shareholders.  By reason of their fiduciary relationships, Defendants specifically owed and owe Plaintiff the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of Patriot National's affairs.

119.    Each of the Defendants consciously and deliberately breached their fiduciary duties of good faith, care, and loyalty to Plaintiff, a Patriot National shareholder, by overseeing and allowing Patriot National to enter in to the Restructured Transaction despite knowing that Defendants would not cause Patriot National to honor the terms of the deal.  By continually refusing to honor the terms of the agreements, and by allowing the Company and Mariano to

needlessly squander corporate assets, the breach of fiduciary has continued under the guidance of the current Board of Directors.

120.     Defendants, individually and in concert, and with actual knowledge, engaged in the above referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to Plaintiff as a Patriot National shareholder.

121.     As a direct and proximate result of Defendants' breached of their fiduciary duties, Plaintiff has sustained, and continues to sustain, significant damages.

**FIFTH CLAIM FOR RELIEF**
**CORPORATE WASTE**
**(Against All Defendants)**

122.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if they were fully set forth herein.

123.     Defendants have a fiduciary duty to protect Patriot National's assets from loss or waste.

124.     Patriot National has agreed to pay all costs and expenses, including attorneys' fees and expenses, incurred by Hudson Bay as a result of any breaches by Patriot National or Mariano of any representations, covenants, warranties, or obligations in any of the Transaction Documents.

125.     By refusing to honor the terms of the Agreements, including but not limited to authorizing wasteful share repurchase programs and dividends, Defendants have caused Hudson Bay's attorneys' fees and expenses to increase substantially, increasing Patriot National's liability under the provisions outlined above, and resulting in corporate waste.

126.     As a result of Defendants' corporate waste, all shareholders, including Plaintiff, have suffered damages.

## SIXTH CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE
### (Against All Defendants)

127.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if they were fully set forth herein.

128.    The Warrants constitute valid and enforceable contracts.

129.    At all times relevant to this Complaint, Defendants have had knowledge of the Warrants.

130.    Defendants intentionally and through wrongful and tortious conduct procured a breach of the Warrants by allowing Mariano to breach the terms of the Back-to-Back Agreement with Patriot National, under which Mariano is required to sell to Patriot National one hundred (100) percent of the number of Shares that are deliverable to Hudson Bay under the Warrants. By intentionally refusing to cause Patriot National to take any action that could result in Mariano honoring his contractual commitment to deliver the Shares due, and by authorizing actions such as the share repurchase program and dividend, Defendants have prevented Patriot National from delivering the Shares due to Hudson Bay pursuant to the Warrants.

131.    Defendants' intentional and tortious conduct was carried out for their own personal financial interest and benefit, and not in the interests of Patriot National or its shareholders.

132.    As a result of Defendants' intentional and tortious conduct, Patriot National has breached the Warrants by failing and refusing to deliver the Shares due and owing to Hudson Bay pursuant to the Warrants and Hudson Bay's Exercise Notices submitted thereunder.

133.    As a result of Defendants' intentional and tortious conduct causing and resulting in Patriot National's breach of the Warrants, Hudson Bay has suffered damages.

134.    By reason of the foregoing, Defendants are liable to Hudson Bay for direct and consequential damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor as follows:

A.   An award of monetary damages against the Defendants, including direct and consequential damages (including, but not limited to, financing and related costs and expenses), jointly and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest thereon.

B.   An award for Hudson Bay's costs and expenses incurred in prosecuting this action and in enforcing and/or collecting upon the Warrants, including, without limitation, reasonable attorneys' fees, costs and disbursements, pursuant to Section 15 of the Warrants and Section 9(k) of the Securities Purchase Agreement.

C.   For such other further relief as the Court may deem just, proper, and in the interest of justice.

Dated:  August 16, 2017
        New York, New York

Respectfully submitted,

LATHAM & WATKINS LLP

By:   /s/ Serrin A. Turner
      Serrin A. Turner

      885 Third Avenue
      New York, NY 10022
      (212) 906-1330
      serrin.turner@lw.com

      *Attorneys for Plaintiff Hudson Bay Master Fund Ltd.*

34